Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 90 C 5456 | **DATE** | 8/29/2000 |
| **CASE TITLE** | William Reynolds, et al. Vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant City of Chicago is entitled to judgment with respect to the 11 blacks who were promoted out-of-rank to lieutenant and the 3 blacks who were promoted out-of-rank order to captain on the remedying-of-the-lingering-effects-of-past-discrimination defense. Enter memorandum and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 30 2000 date docketed | |
| ✓ | Docketing to mail notices. | | | 164 |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 00 AUG 29 AM 11: 45 | | |
| SLB | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIAM REYNOLDS, et al. | ) |
| Plaintiffs, | ) |
| | ) No. 90 C 5456 |
| -vs- | ) |
| | ) JUDGE GEORGE W. LINDBERG |
| CITY OF CHICAGO, | ) |
| Defendant. | ) |

**DOCKETED**

**AUG 3 0 2000**

## MEMORANDUM AND ORDER

Plaintiffs brought this action against defendant, the City of Chicago, claiming they were discriminated against in the process the Chicago Police Department (CPD) used for making promotions to lieutenant and captain in 1990 and 1991. After lengthy pretrial proceedings, the matter was bifurcated for purposes of trial. See FRCP 42(b). It was contemplated that the first phase of the trial would determine liability with the second phase, if necessary, determining damages. The liability phase was originally tried before a jury, though this court's role in deciding the matter was greater than it is in most jury trials because of the nature of the issues involved. The results of that jury trial were not so neat as the parties and the court could have wished.

At that trial, defendant raised two defenses of its out-of-rank order promotions of 1 Hispanic to lieutenant, 5 women to lieutenant, 11 blacks to lieutenant, and 3 blacks to captain. Defendant contended that these out-of-rank order promotions were (1) justified by the Chicago Police Department's (CPD) operational needs and (2) were necessary to remedy unlawful past discrimination by the CPD. In the opinion that followed the jury trial, this court held that none

164

90 C 5456

of the out-of-rank promotions could be justified on the basis of the CPD's internal or external operational need. Because defendant did not challenge the jury's finding against it with respect to the out-of-rank order promotion of the one Hispanic on the remedying-of-the-lingering-effects-of-past-discrimination defense, this court found that plaintiffs were entitled to prevail on liability for that one promotion. The court also granted defendant's motion for judgment as a matter of law with respect to the out-of-rank order promotion of the 5 women to lieutenant on the basis of defendant's remedial justification, finding the jury's answer to a special verdict question to the contrary to have no basis in the evidence.

This was all established in the prior trial of liability. Things were not so neat with respect to the 11 blacks promoted out-of-rank order to lieutenant and the 3 blacks promoted out-of-rank order to captain. This court found the jury's response to questions determinative of liability for the out-of-rank order promotions of the 11 blacks to lieutenant and of the 3 blacks to captain to be inconsistent with respect to the remedying-of-the-lingering-effects-of-past-discrimination defense. Therefore, the court ordered a new trial on liability limited to those promotions and that defense.

The retrial was much streamlined in comparison with the original trial of liability for a number of reasons. First, the parties waived a jury trial, so the retrial was to the bench. Second, there was, of course, the elimination of many issues by this court's opinion and the jury's special verdict. The operational needs defense was completely disposed of by the court, and the parties agreed that the jury's answers to the special verdict questions were controlling,

2

90 C 5456

with the exception of those the court had found to be inconsistent, so there were parts of the remedial defense that did not need to be revisited. Third, the parties agreed that the evidence admitted at the jury trial was admitted at the retrial, so there was no need to repeat the presentation of that evidence. Fourth, the parties agreed, in practice at least, that a special verdict answer of the jury established that there had not been past racial discrimination in the promotional process, so that issue was off the table. Fifth, the parties also agreed that, with respect to the remedial defense, past racial discrimination in hiring was established by the jury verdict, and the sole issue before the court was whether the remedy employed by defendant was narrowly tailored to defendant's past racial discrimination in hiring.

There was additional evidence presented at the retrial; additional testimony by the statistical experts who had testified for the parties at the original trial, Bernard Siskin for defendant and Sandy Zabell for plaintiffs. Dr. Siskin's testimony was as to refinements in his analysis made in response to two matters coming out of the first trial. Dr. Zabell's testimony essentially critiqued Dr. Siskin's analysis.

In order to understand Dr. Siskin's testimony at the retrial, it is first necessary to understand the method he employed in analyzing discrimination in the CPD. It was agreed that from 1977 on there was no hiring discrimination. Therefore, Dr. Siskin compared the percentages of blacks hired by the CPD with the percentage of blacks in the population of the City of Chicago in the appropriate age group and determined that absent discrimination in hiring blacks became CPD officers at a rate approximately 95 percent of their representation in

90 C 5456

the population as a whole. Using that 95 percent rate, Dr. Siskin estimated the number of black hires he would have expected the CPD to make absent discrimination for the entire period during which the candidates for lieutenant and captain were first hired. Dr. Siskin then compared the expected number of black hires with the actual number of blacks hired in those periods. In addition, Dr. Siskin used the expected number of black hires from those periods to arrive at an estimated number of blacks who would have been lieutenants and captains had there been no discrimination in hiring and no discrimination in the promotional process. Subtracting the actual numbers of blacks who were lieutenants and captains from the expected numbers Dr. Siskin had found, gave Dr. Siskin an estimate of the shortfalls due to discrimination in the hiring and promotional processes.

The first trial exposed a couple of weaknesses in Dr. Siskin's analysis.

First, Dr. Siskin had assumed that residency in the City of Chicago was required in order to become a CPD officer throughout all the periods for which he did statistical analyses. It is undisputed that persons who were actually hired were required to reside in Chicago while employed by the CPD. However, a newspaper article in the early 1960s reporting the names and addresses of persons hired as police officers suggested that at the time of the article there was likely no residency requirement for applicants, since about 4.5 percent of the addresses of those hired had suburban addresses. There was also in evidence an announcement for a December 4, 1971, police test which required that all applicants be residents of the City at the time they took the test. Hiring based on this 1971 test occurred in 1973.

4

90 C 5456

Therefore, Dr. Siskin reran his analyses, this time assuming that 95 percent of the applicants were from the City proper and 5 percent were from the metropolitan area excluding Chicago for hiring before 1973, but that all applicants were from the City proper beginning in 1973. This had the effect of reducing slightly the shortfalls observed in the lieutenant and captain ranks because the percentage of blacks in the population of the metropolitan area excluding Chicago was lower during the entire period at issue than the percentage of blacks in the population of the City itself.

Second, one of the results of the first trial the parties agree is not to be revisited at this trial is the jury's conclusion that plaintiff proved there was no discrimination in the promotional process. Dr. Siskin in response reran his analysis of the captain's rank eliminating the effect of the promotional process on black representation in that rank. He did not rerun his analysis of the lieutenant's rank so as to eliminate the effect of the promotional process because the statistics showed that the promotional process had actually somewhat favored blacks in the relevant period. Therefore, all of the shortfalls found in the lieutenant's rank were attributable to hiring disparities.

After rerunning the analyses, Dr. Siskin found fewer shortfalls in both ranks in 1989, 1990, and 1991, than he had previously. The effect of rerunning the analyses was greater for the captain's rank than for the lieutenant's rank. However, for both ranks, the shortfalls Dr. Siskin estimated still exceeded the number of out-of-rank order promotions defendant made.

5

Defendant made 11 out-of-rank promotions of black sergeants to lieutenant. After adjusting the expectations for the inclusion of applicants from the metropolitan area outside of Chicago prior to 1973, Dr. Siskin found that at the end of 1989 there was a shortfall of 24 black lieutenants; at the end of 1990 a shortfall of 22 black lieutenants; and at the end of 1991 a shortfall of 20 black lieutenants.

Defendant made 3 out-of-rank order promotions of black lieutenants to captain in 1990. After adjusting the expectations for the inclusion of applicants from the metropolitan area outside of Chicago prior to 1973, and after pulling the effect of the promotional process out of the numbers, Dr. Siskin still found that at the end of 1989 there was a shortfall of 6 black captains; at the end of 1990 a shortfall of 8 black captains; and at the end of 1991 a shortfall of 8 black captains. If the out-of-rank order promotions had not been made, there would have been shortfalls of 11 black captains in both 1990 and 1991. Dr. Siskin explained why the number of shortfalls rose in 1990 and 1991 despite the out-of-rank order promotions. Dr. Siskin found no statistical evidence of hiring discrimination in the 1950s, but did find statistical evidence of hiring discrimination in the 1960s. In fact, the past hiring discrimination found by the jury and whose lingering effects were in need of remediation pretty much all came from 1960s hiring. Because the applicant pool for captain in 1990 was lieutenants predominately hired as officers in the 1960s, the effect of the hiring discrimination in that decade more than offset the affirmative action of promoting three black lieutenants out-of-rank order to captain in 1990.

Dr. Sandy Zabell did not fundamentally with disagree Dr. Siskin's analyses–on this both Dr. Zabell and Dr. Siskin were agreed. Dr. Zabell did, however, disagree with Dr. Siskin on a couple of points.

Dr. Siskin did not believe it was appropriate to perform a test of statistical significance on the data. According to Dr. Siskin, such a test would be appropriate if the question were whether there was past hiring discrimination. Since the jury already had determined that question, the task was to determine the best estimate of the lingering effects of that discrimination, and the shortfalls found after removing the effects of the promotional process were the best estimates available of those lingering effects. Dr. Zabell on the other hand looked at the shortfalls in terms of standard deviations and so would perform tests of statistical significance on the data.

In addition, Dr. Siskin found no evidence of hiring discrimination for the 1950s. Therefore, if he were to perform a test of statistical significance it would be only with respect to the effect of hiring in the 1960s, and would not include the 1950s hiring data. Dr. Zabell on the other hand would analyze the data by performing a test of statistical significance including hiring from both the 1950s and 1960s. Because of the lack of statistical evidence of hiring discrimination in the 1950s, the inclusion of hiring from the 1950s would have the effect of swamping out any statistical effect of discriminatory hiring in the 1960s.

The Seventh Circuit recently discussed narrow tailoring in another reverse discrimination case against the CPD. In that case, the court said:

7

> In addition to showing hard proof of a compelling interest, strict scrutiny requires the government to come forward with evidence that its affirmative action plan is narrowly tailored. Adarand [Constructors, Inc. v. Pena, 515 U.S. 200, 235 (1995)]. An affirmative action plan is narrowly tailored if, as a practical matter, "it discriminates against whites as little as possible consistent with effective remediation." McNamara [v. City of Chicago, 138 F. 3d 1219, 1222 (7th Cir.1998)]. Once the governmental entity has shown acceptable proof of a compelling interest in remedying past discrimination and illustrated that its plan is narrowly tailored to achieve this goal, the party challenging the affirmative action plan bears the ultimate burden of proving that the plan is unconstitutional. Aiken v. City of Memphis, 37 F.3d 1155, 1162 (6th Cir.1994); Concrete Works of Colo., Inc. v. City and Cty. of Denver, 36 F.3d 1513, 1521 (10th Cir.1994).
>
> . . . .
>
> To determine whether an affirmative action plan is narrowly tailored, the test we use is whether the racially preferenced measure is "a plausible lower-bound estimate of a shortfall in minority representation" that is caused by past discrimination. McNamara, 138 F3d at 1224.

Majeske v City of Chicago, 218 F3d 816 (7th Cir 2000). Thus, in this second trial of liability, there are two burdens of proof on the issue of narrow tailoring. First, defendant has a burden to come forward with evidence that the affirmative action it took was narrowly tailored. Second, if defendant comes forward with such evidence, plaintiffs bear the ultimate burden of proving that the affirmative action taken was not narrowly tailored.

At the prior trial of liability, this court concluded defendant had met its burden of coming forward with evidence that the affirmative action it took was narrowly tailored. Defendant contends that since the evidence from that prior trial is being admitted at this retrial, this court should conclude that defendant at the retrial has met its burden of production. Although not conceding this point, plaintiffs do not strongly contest it. The court concludes

8

90 C 5456

that defendant did meet its burden of coming forward with evidence that the affirmative action it took was narrowly tailored. Thus, the only question remaining is whether plaintiffs proved that the affirmative action was not narrowly tailored.

Plaintiffs argue that defendant cannot rely on Dr. Siskin's analyses at all. Plaintiffs' position is that prior to making the out-of-rank order promotions, defendant relied on a different analysis–an inter-rank analysis–in justifying the affirmative action it was taking, and that defendant cannot rely on Dr. Siskin's subsequent analyses at this trial.

In his letter to Chicago Police Superintendent Leroy Martin on July 12, 1990, Commissioner of Personnel Glenn E. Carr included a chart showing the racial (white, black and Hispanic) and gender (male and female) composition of the CPD ranks of captain, lieutenant, sergeant and detective, as well as the same information for eligibles for the ranks of sergeant and detective. Following the chart, Commissioner Carr said:

> Despite the City's compliance with court orders and its other efforts in recent years to eradicate the effects of discrimination from the ranks of the Police Department, those efforts have not yet been fully successful. The race and sex composition of the promotional ranks simply would not look like this if there had been no prior discrimination in hiring and promotion. Since the department continues to reflect the effects of that past discrimination, remedial action is still both justified and necessary.

Thus, prior to making the out-of-rank order promotions, defendant relied on there having been prior hiring and promotional discrimination in the CPD as its justification for the affirmative action taken.

According to plaintiffs, defendant in this case can only rely on an inter-rank comparison to establish past discrimination. Yet, while an inter-rank comparison could

9

90 C 5456

certainly be probative of promotional discrimination–showing any disparities in the racial makeup of a rank and of the ranks above or below it–it could never be probative of hiring discrimination, since it does not include a comparison of those hired with the total pool of those seeking to be hired. As gratifying as this result might be for plaintiffs, it is not warranted. Having said before making the out-of-rank order promotions that they were justified on the basis of past hiring discrimination, defendant is not limited to the statistics it considered at that time in its efforts to prove that there was past hiring discrimination to be remedied. Defendant has not changed its reason for the affirmative action–that reason remains past hiring discrimination. Rather, defendant has supplied better evidence that its reason of past hiring discrimination was in fact true. Plaintiffs have cited no case forbidding this.

As to Dr. Bernard Siskin, this court finds his testimony to be highly credible, and credits his testimony in those few places in which he and Dr. Zabell were in disagreement. As to the use of tests of statistical significance, Dr. Siskin was quite persuasive in his explanation that they are not appropriate after it has been decided there was past hiring discrimination, when the question is what effect that past hiring discrimination is still having. The best estimate of that effect is the shortfall found after eliminating the effect of the promotional process. The court also agrees with Dr. Siskin that it is appropriate to examine just the effects of hiring discrimination in the 1960s in analyzing the data. If there was hiring discrimination in the 1960s that is enough to justify the affirmative action taken if that hiring discrimination continued to have lingering effects at the time of the promotions; it was not necessary to

include in the statistical analyses data for the 1950s, when there is no statistical evidence of hiring discrimination in that decade.

As to Dr. Siskin's modification of his analysis to take into account that residency was not required to take the CPD hiring examination for some parts of the period in which hiring discrimination was claimed by defendant, plaintiffs contended the correction Dr. Siskin made was insufficient. Dr. Siskin modified his analysis to assume that the applicants for patrol officer were 95 percent from within the City proper and 5 percent from the metropolitan area not including Chicago. Plaintiffs contended the ration should be 90 percent from Chicago and 10 percent outside of Chicago, on the basis that these numbers had been given to Dr. Siskin by counsel for defendant as the numbers that resulted when defendant had recruited nationally in later years. Dr. Siskin explained that he had used the 95/5 percentages because (1) the newspaper article from the 1960s was the best data he had on what those percentages were at that time and (2) there was not a national recruiting effort at the relevant time period in the 1960s. On this point Dr. Siskin is more persuasive than counsel for plaintiffs; the 95/5 percent ratio of applicants from Chicago and from the metropolitan area outside of Chicago is more likely accurate with respect to the makeup of the applicant pools for patrol officer before 1973.

Finally, there is the question of whether plaintiffs proved that the remedial action taken was not narrowly tailored with respect to each of the ranks at issue. On this question, plaintiffs would have it that McNamara v City of Chicago, 138 F3d 1219, 1222 (7th Cir 1998), and Majeske v City of Chicago, 218 F3d 816 (7th Cir 2000), set not only the test to be used to

90 C 5456

determine narrow tailoring, but also established the numerical limits for what a plausible lower-bound estimate may be. This is a plain misreading of those cases. In each case, the statistics that were discussed were those that had been adduced by the parties at trial. Based on the statistics in the record, the court in each case determined that the affirmative action undertaken had not been too much for narrow tailoring purposes. Neither case purports to establish a maximum limit on either the number of shortfalls that may be made up or on how close the percentage of minorities in a rank may be to the percentage of minorities in an applicant pool consistent with narrow tailoring.

The question of whether the out-of-rank promotions to lieutenant and captain were narrowly tailored to the past hiring discrimination in the CPD made may now be addressed..

First, there are the promotions to lieutenant. At the end of 1989, prior to the out-of-rank order promotions, there were 24 less black lieutenants than would have been expected if there had been no hiring discrimination. At the end of 1991, after all of the out-of-rank promotions were made, there were still 20 less black lieutenants than would have been expected if there had been no hiring discrimination. In other words, if defendant had not made the 11 out-of-rank order promotions that it did, there would have been a shortfall of 31 black lieutenants in the CPD in 1991. The 11 out-of-rank order promotions of Blacks to lieutenant then easily constituted a plausible lower-bound estimate of the shortfall in minority representation at the lieutenant's rank caused by past hiring discrimination in the CPD.

12

90 C 5456

Second, there are the captains. Here the question is closer. At the end of 1989, there was a shortfall of 6 black captains in the CPD. Defendant made the 3 out-of-rank order promotions to captain in 1990. Nonetheless, at the end of 1990 there was a shortfall of 8 black captains; and at the end of 1991 there was a shortfall of 8 black captains. If there had been no out-of-rank order promotions in 1990, the shortfalls for the end of 1990 and the end of 1991 would have been 11 black captains. Dr. Siskin explained that the reason the shortfalls rose despite the affirmative action was that the applicant pool for promotion to captain in 1990 came predominately from lieutenants first hired in the 1960s, and so reflected further effects of the hiring discrimination that took place in the 1960s. The parties disputed whether it was appropriate to consider the 6 shortfalls before the out-of-rank order promotions occurred, the 8 shortfalls after the out-of-rank order promotions were made, or the 11 shortfalls that would have been observed at the end of 1990 and 1991 if the out-of-rank order promotions had not been made. The court agrees with plaintiffs that the 11 shortfalls that would have been observed absent the 3 out-of-rank order promotions is the appropriate number of shortfalls to consider. Dr. Siskin's testimony was that the increase in shortfalls was the result of hiring discrimination in the 1960s. It is appropriate to consider what would have occurred had the 3 out-of-rank order promotions not been made. See Wittmer v Peters, 87 F3d 916, 920 (7th Cir 1996) (considering whether a prison boot camp could "succeed in its mission . . . with as white a staff as it would have had if a black male had not been appointed to one of the lieutenant slots.").

13

90 C 5456

Thus, there would have been 11 less black captains than expected absent hiring discrimination at the end of 1990 and 1991 if no out-of-rank promotions to that rank had been made. Defendant made only 3 out-of-rank order promotions of blacks to captain in 1990, leaving shortfalls of 8 at the end of 1990 and 1991. Given these numbers, the out-of-rank order promotion of 3 black lieutenants to the rank of captain in 1990 was a plausible lower-bound estimate of the shortfall in minority representation at the captain's rank caused by past hiring discrimination in the CPD.

Plaintiff has failed to prove that the out-of-rank order promotion of 11 blacks to lieutenant and of 3 blacks to captain was not narrowly tailored to remedy past hiring discrimination in the CPD. Defendant is entitled to judgment with respect to these 14 out-of-rank order promotions.

ORDERED: Defendant City of Chicago is entitled to judgment with respect to the 11 blacks who were promoted out-of-rank order to lieutenant and the 3 blacks who were promoted out-of-rank order to captain on the remedying-of-the-lingering-effects-of-past-discrimination defense.

ENTER:

GEORGE W. LINDBERG
District Judge

DATED: AUG 2 9 2000

14